**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| Ciright, Inc. | : |
| Plaintiff | :     CASE NO:_____ |
| vs. | : |
| Jeff Vanderbilt, Peter Gantner, | : |
| TruBadger, Inc., Kula Brands, Inc., and | : |
| Nexus Ecosystem, Inc. | : |
| Defendants. | : |

_____

<u>**CIVIL ACTION COMPLAINT**</u>

Plaintiff, Ciright, Inc., by and through its undersigned counsel, George Gossett, Jr., Esquire, hereby avers:

**PARTIES**

1. Plaintiff, Ciright, Inc., hereafter ("Ciright") is a Delaware Corporation with its principal place of business located at 7 Union Hill Road, Conshohocken PA 19438.

2. Defendant, Jeff Vanderbilt, (hereafter "Vanderbilt") is an individual Florida resident with a principal residence located at 11892 Haga Run, Parkland, FL 33076-4661.

3. Defendant, Peter Gantner, (hereafter "Gantner") is an adult individual Arizona resident with a principal residence located at 9501 E. Broadway Road, Meza, AZ 85208.

4. Defendant Nexus Ecosystem, Inc., (hereafter "Nexus") is an entity owned and controlled by Gantner via his Arizona address located at 9501 E. Broadway Road,

Meza, AZ 85208.

5.      Defendant TruBadger, Inc., (hereafter "TruBadger") is an entity owned and

controlled by Gantner via his Arizona address located at 9501 E. Broadway Road,

Meza, AZ 85208.

6.      Defendant Kula Brands, Inc., (hereafter "Kula") is an entity owned and controlled

by Gantner via his Arizona address located at 9501 E. Broadway Road, Meza, AZ

85208.

## JURISDICTION AND VENUE

7.      This is an action under both state law and Sections 4 and 16 of the Clayton Act,

15 U.S.C. §§ 15 and 26 to recover treble damages, costs of suit, and reasonable

attorneys' fees.

8.      Plaintiff's federal antitrust claims are based on Defendant's unlawful actions and

conspiracy with third parties and arise under Section 1 of the Sherman Act, 15 U.S.C. §

1, and Section 2(a) of the Robinson Patman Act, 15 U.S.C. § 13.

9.      This Court has original jurisdiction over the federal subject matter of this action

pursuant to 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction over the

appended state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 15 U.S.C. § 22, because Plaintiff is found and

transacts business in this District and much of the work performed with respect to this

matter occurred within the district.

11.     Venue is also proper under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this District.

12. The Court has personal Jurisdiction over Vanderbilt as he is the managing member of Stardom, Inc. with its registered office located at 7 Union Hill Road, Conshohocken, PA 19438.  He directed a Conshohocken based transaction services firm, Trx Services, LLC, (hereafter "Trx")  located at 18 Elizabeth Street, Suite 110, Conshohocken, PA 19428 to manage the payment processing of Stardom's NFT sales.  Vanderbilt regularly conducted meetings in furtherance of the business at Stardom's registered office, 7 Union Hill Road, Conshohocken PA 19438. And Vanderbilt directed his Stardom co-member, Ciright, to provide extensive software development services at its main office, 7 Union Hill Road, Conshohocken, PA 19438.

**FACTUAL BACKROUND**

13.     In 2022, Stardom Chance, LLC was founded and capitalized by Ciright with Vanderbilt, its managing member.  Thereafter, and in accordance with the members' agreement, the parties Incorporated Stardom Chance, Inc. with a registered address at 7 Union Hill Road, Conshohocken, PA 19438 to take on third party investment capital. Exhibit "A" hereto is the Stardom Cap Table which identifies the equity that Ciright and other members own and control.  Exhibit "B" is the Stardom Membership/Operating Agreement.

14.     The instant action arises from Vanderbilt's breach of the Stardom Operating Agreement and his conspiracy with the remaining defendants to tortuously interfere with the Membership Agreement between Stardom and Plaintiff as well as the prospective

contractual relations being negotiated between Plaintiff and third parties at the time of Defendants' interference.

15.     According to Wikipedia, An NFT is a non-fungible token, that is, a unique digital identifier that cannot be copied, substituted, or subdivided, that is recorded in a blockchain, and that is used to certify authenticity and ownership. On or about March 20, 2022, Stardom scheduled the sale of its first NFT collection, created cy Ciright, for September 15, 2022.  During this period, Defendant Vanderbilt made many trips to Stardom's registered office at 7 Union Hill Road Conshohocken, PA in furtherance of the business objective to sell NFT collections.

16.     On June 20, 2022, it was discovered by Plaintiff that Defendant Vanderbilt had exhausted the campaign funds without accounting for any expenditures as required by the Stardom Membership/Operating Agreement.

17.     On August 24, 2022 Ciright and Vanderbilt began good faith discussions with respect to expenditure accounting and a successful NFT launch.

18.     During the engagement, it was discovered that Vanderbilt had misappropriated Stardom funds by consistently transferring corporate funds to his personal account and then exhausting the funds without any expense documentation as required by the Operating Agreement.

19.     In addition it was discovered that Vanderbilt cooperated with the remaining defendants to create competitive products to Stardom, including StarBabies.com, and

scheduled an NFT drop in direct competition with Stardom and in violation and breach of the Stardom Membership/Operating Agreement.

20. In addition it was discovered that Vanderbilt orchestrated a fraudulent campaign, having his contacts, who had pre-purchased Stardom NFT's, to disingenuously request credit card charge backs from Trx in Conshohocken. This is currently depleting the Stardom account at Trx and it is unfairly advantaging its competitor Starbabies.com which was propped up by the defendants to steal Stardom's customers.  See chargeback correspondence from Trx attached as Exhibit "C".

## Count I – Tortious Interference with Contract

21.     Plaintiff realleges and reincorporates each of the foregoing paragraphs by reference as if fully set forth herein.

22.     Ciright had valid equity with Stardom reflected in Exhibit "A".

23.     Ciright had an agreement with Stardom to provide exclusively all technology and NFT drops per Exhibit A.

24.     Ciright invested over $1,177,440.00 in technology support for this effort. See Exhibit "D".

25.     Defendants had full knowledge of Ciright's investment with Stardom.

26.     Defendants intentionally and in bad faith created a competitive website, "Star Babies", to compete with Stardom, in violation of the membership agreement.

27.     Defendants had and have no lawful justification for its tortious interference with Stardom's business and NFT drops.

28.     Plaintiff has suffered and will continue to suffer damages due to Defendants' tortious interference with its contracts and/or prospective economic advantage.

29.     Defendants are liable to Plaintiff for its lost prospective NFT drops.

30.     Defendants are liable to Plaintff for its lost economic advantages that have occurred as a direct result of their tortious behavior.

Wherefore, Plaintiff requests reimbursement of $1,177,440.00.  Alternatively Plaintiff requests a temporary injunction precluding Defendants from competing against Stardom via StarBabies.com and/or any other competitive product and compelling Defendants to submit to Mediation and if necessary Arbitration pursuant to the Stardom Operating Agreement.

## Count II – Business Defamation and Disparagement

31.     Plaintiff realleges and reincorporates each of the foregoing paragraphs by reference as if fully set forth herein.

32.     On information and belief, Defendants caused to be published defamatory remarks about Ciright, its business practices, its operations, its professionalism and its methods and manner of doing business to third persons.

33.     No privilege, absolute or conditional, attaches to these statements.

34.    Defendants' false statements have negatively affected Ciright in its business

reputation and economic interests. As a result of Defendant's defamatory remarks,

certain customers have ceased to do business with Ciright.

35.    Defendant's statements were designed to disrupt and harm Ciright's business

reputation and have caused such harm.

36.    Each of the above-referenced acts and omissions, singly or in combination with

others, constituted business disparagement, which proximately caused the general and

special damages suffered by Ciright.

Wherefore, Plaintiff requests compensatory damages.  Alternatively, Plaintiff requests a

temporary injunction precluding Defendants from competing against Stardom via

StarBabies.com and/or any other competitive product and compelling Defendants to

submit to Mediation and if necessary Arbitration pursuant to the Stardom Operating

Agreement.

## **Count III**

### **BREACH OF CONTRACT VIA PROMISSORY ESTOPPEL AND DETRIMENTAL RELIANCE**

37.    Plaintiff realleges and reincorporates each of the foregoing paragraphs by

reference as if fully set forth herein.

38.    According to the doctrine of promissory estoppel, Plaintiff's detrimental reliance,

in an amount over One Million Dollars, on Defendant Vanderbilt's assent to the

Operating Agreement is the consideration necessary to effectuate the Operating Agreement.

39.     Defendant Vanderbilt should have reasonably expected that his adherence to the terms of the Operating Agreement for almost a year would induce Plaintiff to provide services as promised in the Operating Agreement, which in this case it did to the financial detriment of over One Million Dollars.

40.     In effect, Plaintiff's detrimental reliance creates the consideration necessary for the formation of the Operating Agreement, the breach of which is actionable.

41.     Here, Defendant Vanderbilt conducted himself according to the terms of the Stardom Operating Agreement, with respect to meetings, reporting and engaging Ciright for all of Stardom's technology needs for almost a year.

42.     Defendant Vanderbilt's affirming behavior of the Stardom Operating Agreement was the status quo from Company inception until July 2022.

43.     In reliance on Defendant Vanderbilt's promises and affirming behavior, Ciright invested over $1,177,440.00 in the Company, thereby establishing the contract and its breach.

Wherefore, Plaintiff requests reimbursement of $1,177,440.00.  Alternatively, Plaintiff requests a temporary injunction precluding Defendants from competing against Stardom via StarBabies.com and/or any other competitive product and compelling Defendants to submit to Mediation and if necessary Arbitration pursuant to the Stardom Operating Agreement.

Respectfully submitted,

*George Gossett, Jr.*

George Gossett, Jr., Esq.

Attorney for Plaintiff

4840 Old York Road

Philadelphia, PA 19141

(267) 978-1879

## **Verification**

      I, Joseph Callahan do herby certify that I am the CEO of Plaintiff Ciright herein and that I am authorized to make this verification and I do hereby verify that the facts set forth in the foregoing Pleading are true and correct to the best of my knowledge, information and belief and are made subject to the penalties regarding providing unsworn falsifications to authorities.

*Joseph Callahan*

_____
Joseph Callahan         Dated: 10/7/22

# **Exhibit A**

| Sr No | First Name | Last Name | Amount of Stock | Tokens $1 | Issued | Escrow | Net % |
|---|---|---|---|---|---|---|---|
| 1 | Jeff | Vanderpol | | | | | 53.75% |
| 2 | Ciright | | | $ 2,000,000.00 | $ 2,000,000.00 | | 25.00% |
| 3 | JMPC | | | $ 80,000.00 | $ 80,000.00 | | 1.00% |
| 4 | CFO | | | $ 320,000.00 | $ - | $ 320,000.00 | 4.00% |
| 5 | CMO | | | $ 320,000.00 | $ - | $ 320,000.00 | 4.00% |
| 6 | COO | | | $ 320,000.00 | $ - | $ 320,000.00 | 4.00% |
| 7 | Brian | Readnour | $10,000 | $10,000 | $10,000 | | 0.13% |
| 8 | Byron | Scott | $ 150,000 | $ 150,000.00 | $ 150,000.00 | | 1.88% |
| 9 | Chris | Sawchuk | $25000 | $25000 | | | 0.31% |
| 10 | CJ | Jackson | $100,000 | $100,000 | | | 1.25% |
| 11 | David | Pipe | $50000 | $50000 | | | 0.63% |
| 12 | David | Walsh | $25000 | $25000 | | | 0.31% |
| 13 | Dave | Jensen | $ - | | | | 0.00% |
| 14 | Edwin | Reyes | $ - | $ 80,000.00 | | | 1.00% |
| 15 | Elizabeth | Escandor | $ - | $ 20,000.00 | $ 20,000.00 | | 0.25% |
| 16 | Frank | Ray | $ 10,000 | $ 10,000.00 | $ 10,000.00 | | 0.13% |
| 17 | Free | Boogie | $ - | | | | 0.00% |
| 18 | Geoff | Deller | $ - | $ 120,000.00 | | | 1.50% |
| 19 | Giovanni | Pierre | $15,000 | $15,000 | | | 0.19% |
| 20 | Jacqui | Lewsam | $ - | $ 10,000.00 | $ 10,000.00 | | 0.13% |
| 21 | James Taylor | Bruce | $ - | | | | 0.00% |
| 22 | John | Carson | $ 75,000 | $ 75,000.00 | $ 75,000.00 | | 0.94% |
| 23 | John | Zulk | $75000 | $75000 | $ 75,000.00 | | 0.94% |
| 24 | Jose | Corranza | $50,000 | $50,000 | | $ 50,000.00 | 0.63% |
| 25 | Jose | Rodriguez | $50,000 | $50,000 | | $ 50,000.00 | 0.63% |
| 26 | Juan | Manuel | $50,000 | $50,000 | | $ 50,000.00 | 0.63% |
| 27 | Lloyd | Gerber | $ 75,000 | $ 75,000.00 | | | 0.94% |
| 28 | Mandi | Bagley | $10,000 | $10,000 | | $ 10,000.00 | 0.13% |
| 29 | Matt | Corry | $20,000 | $20,000 | | | 0.25% |
| 30 | Matt | Garry | $100,000 | $100,000 | $ 100,000.00 | | 1.25% |
| 31 | Mauricio | Luengas | $200,000 | $200,000 | | | 2.50% |
| 32 | NFT | Workx | $150,000 | $150,000 | | $ 150,000.00 | 1.88% |
| 33 | Racheal | Ihim | $15,000 | $15,000 | | $ 15,000.00 | 0.19% |
| 34 | Richard | D'Alessio | $25,000 | $25,000 | | $ 25,000.00 | 0.31% |
| 35 | Victor Garcia | DeRosa | $ - | $ 120,000.00 | | | 1.50% |
| 36 | Vivian | Pena | $25,000 | $ 25,000.00 | | | 0.31% |

# **Exhibit B**

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT SUMMARY**

**OF Stardom Chance, LLC (a Florida limited liability company)**

**THIS OPERATING AGREEMENT** ("Agreement") is entered into as of the 21day of September, 2021, by and between the following persons:

1. Jeff Vanderpol, an individual and resident of Florida.

2. Ciright Inc, a Delaware C Corporation, with its principal place of business at 7 Union Hill  Road, West Conshohocken, PA 19428, sometimes hereinafter called **"Ciright"**

3. Joseph Callahan, an individual and resident of Florida.

4. Three (3) Additional Co-Founders to be named at a future date upon company additional capitalization.

**FOR VALUABLE CONSIDERATION**, the receipt and sufficiency of which is hereby acknowledged, the Parties covenant, contract and agree as follows:

**ARTICLE I**

**FORMATION OF LIMITED LIABILITY COMPANY**

1.1 Formation of LLC.

1.2 Articles or Organization

1.3 Business.

. (a)  Technology company with enterprise software to service the entertainment movie  production industry.

. (b)  Branding opportunities for **STARDOM Tech**;

. (c)  License technology related to the content; and

. (d)  Marketing opportunities for third party sponsors related to the Content (clauses (a), (b), (c) and (d) are collectively referred to as the "Business");

. 1.4  Registered Office and Registered Agent.

. 1.5  Duration. The LLC and will continue in perpetuity.

. 1.6  Fiscal Year. The LLC's fiscal and tax year shall end December 31.

## ARTICLE II  MEMBERS; MEMBERSHIP INTERESTS

2.1 Members. The initial members of Stardom Chance, LLC, their initial capital contributions, and their percentage interest in LLC are:

_____. ____ _____ ____

Jeff Vanderpol Ciright, Inc. Joseph Callahan COO (Co-Founder to be named) CFO (Co-Founder to be named) CMO (Co-Founder to be named)

*(a) See Rider 2.1(b)*

62 % Interest 25 % Interest 1% Interest (Non Dilutable Interest) 4% Interest 4% Interest 4% Interest

2.2 Membership Interests.

Members' Voting Power. The Membership Interests will have in the aggregate 100% of the overall voting power with each Member voting its/his/her pro-rata share of the Membership Interests.  **ARTICLE III MANAGEMENT**

3.1 Management. The management of the LLC shall be vested in the Board of Managers (**"Board"**).

. (a)  Two (2) Managers selected by Ciright, initially namely: Joseph M. Callahan and Mike Conway as its two managers.

. (b)  Two (2) Managers selected by Jeff Vanderpol, initially namely: Jeff Vanderpol and _____; and

. (c)  One (1) outside Manager jointly appointed provided the parties use good faith efforts to appoint an individual that is mutually acceptable to each party.

. (d)  Without limiting Article V (with respect to meetings), any action required

or permitted to be taken by the Board may be taken without a meeting if, all of the Board managers receive at least 3 business days written notice of the proposed Board action, and a majority of the Board consent in writing, and such writing or writings are filed with the records of the meetings of the Board; such consent shall be treated for all purposes as the act of the Board.

3.2 Tax Classification. The Members by executing this Agreement acknowledge their intention that the LLC be classified, for federal and state income tax purposes, as a partnership and not an association taxable as a corporation pursuant to Section 7701(a)(2) of the Code and the Regulations promulgated thereunder and hereby agree that the provisions of this Agreement shall be applied and construed in a manner to give full effect to such intent. Each Member further agrees to execute and deliver such further agreements or instruments and do, or cause to be done, such further acts and things, as may be reasonably necessary, in the opinion of the Members and counsel to the LLC, to cause the LLC to be classified as a partnership for federal income tax purposes.

_____ _____ _____ _____ _____ _____ _____
3.3 Approval Rights.

 (a) Super Majority of the Board. The following actions require a majority vote of the Board, i.e., three managers, provided that at least one manager designated by each Founding Member is part of such majority:

.  (i)  a material amendment of this Agreement,

.  (ii)  the issuance of debt in excess of one million dollars $1,000,000.00

USD in the aggregate,

(iii) acquisitions of other entities or substantially all of the assets of any other entity in excess of $5,000,000.00

(iv) sale of a material line of business,

(v) the formation of subsidiaries,

(vi) aggregate capital expenditures and research/development expenses that exceed two-hundred and fifty thousand dollars ($250,000.00 USD) in any fiscal year,

. (vii)  any material changes in the nature or operations of the Business,

. (viii)  any increase in the size of the Board of Managers other than as

contemplated in Section 3.1 and (ix) the transfer of any Membership Interests.

. (b)  Manager Approval Rights. The Stardom appointed managers shall have
approval rights over all day-to-day operations of product concept, sales,
marketing, finance and other general administrative functions of the
business (including for example a selection of alternative technology, e.g.,
not to compromise the business interest of the LLC), and the Ciright
appointed managers shall have approval rights over all day-to-day
operations of product development (i.e., software and hardware matching
the product concept), manufacturing, logistics and technical support.

. (c)  Expulsion.

(i) Only fraud or willful misconduct may the Board expel a Board Manager's
appointed manager, or, expel a Ciright appointed manager.

3.4 C-Level Staff, Managers and Officers.

Jeff Vanderpol shall be the initial Chief Executive Officer (CEO) of
STARDOM.

Joe Callahan shall be the initial Chief Technology Officer (CTO).

3.5 Change of Control. In the event of a change of control in either of the
Founding Members, then the Founding Member subject to the change of control
shall provide as much advance written notice as is practicable, but in any event
not less than one month, and the parties shall negotiate whether to dissolve the
LLC. If the parties cannot agree on dissolution, then the parties agree to submit
the matter to arbitration pursuant to the terms of this Agreement. **"Change of
control"** means any assignment, merger, joint venture or other corporate action
in which a Member ceases to maintain complete control of its business, assets
and operations.

**ARTICLE IV**

**CONTRIBUTIONS, PROFITS, LOSSES, AND DISTRIBUTIONS**

    4.1  Interest of Members.

    Ownership Interest set forth on Schedule 1

    4.2  Contributions.

Ciright shall provide to the LLC the services listed on Exhibit A at a discounted rate, i.e., at cost; and

(i) contribute to LLC non-exclusive, perpetual (the **"Licenses"**) for the technologies described on Exhibit B and Exhibit C hereto and are deemed to have been fully paid upon contribution. The licenses are for IP and software excluding utility consumption of the technology resulting from bandwidth, storage capacity, and CPU usage.

(ii) complete the Base Operational Platform at no cost to Stardom Chance for business commercialization. This version 1.0 shall be specified feature set and functionally as detailed in the UI UX experience articulated and documented utilizing industry accepted tools.

 (iii) Base Platform shall be completed on or before August 1, 2022

4.3 Additional Capital Contributions and Members Loans.

Managers shall send a notice thereof to the Members, describing the needs of the LLC to obtain Additional Funds.

No Member shall have any personal liability to provide such Additional Capital Contributions.

(c) *Member Loans*. In the event that the Founding Members do not obtain super majority approval to provide the LLC with Additional Funds, any Founding Member may make a loan to the LLC (**"Founding Member Loan"**) on market terms.

4.4  Record of Contributions/Ownership. This Agreement, any amendment(s) to this Agreement, and all Resolutions of the Members of the LLC shall constitute the record of the Members of the LLC and of their respective interest therein.

4.5  Profits and Losses. The profits and losses and all other tax attributes of the LLC shall be allocated among the Members in accordance with IRS rules and regulation, as may be amended from time to time.

4.6  Distributions of Available Cash. *See Rider 4.6*.

4.7  Tax Distributions. If the Company has

(a)  available Cash and

(b)  cumulative, net taxable income for federal income tax purposes for any taxable year, then

(i) the Company will distribute at least an amount of cash (a **"Tax Distribution"**) to each Member which, when combined with all other distributions to such Member (in its capacity as a Member) in the current taxable year, equals the product of (z) the highest combined federal, state and local marginal income tax rate applicable to any Member and (y) cumulative, net taxable federal income allocable to the Member for such taxable year (and all prior taxable years).

(ii) To the extent Tax Distributions are made to a Member pursuant to this Section 4.7, such distributions shall be treated as an advance against, and thus shall reduce the amount of, distributions otherwise to be distributed to such Member pursuant to Section 4.6.

(iii) **"Available Cash"** means cash of the Company after provision for the cash requirements of the management and operation of the Company's business (including sufficient amounts for taxes, insurance, debt service and salaries) and for the restoration, creation and increase of adequate and customary reserves, all as determined from time to time by and in the sole discretion of the Members to be available for distribution to the Members.

**ARTICLE V**

**VOTING; CONSENT TO ACTION**

Voting by Members. Only Founding Members shall be entitled to vote on all matters which provide for a vote of the Members in accordance with each Member's percentage of Ownership Interest.

Majority Required. Except as otherwise required herein, a majority of the Members, based upon their Ownership Interest, is required for any action. Where Super Majority Voting is required, this shall represent member interest in excess of 65%.

Meetings - Written Consent. Action of the Members may be accomplished with or without a meeting. If a meeting is held, evidence of the action shall be by Minutes or Resolution reflecting the action of the Meeting, signed by a majority of the Members. Action without a meeting may be evidenced by a written consent signed by all of the Members.

Regular Meetings; Quarterly Required Meetings.

. (a)  Regular meetings of the Members may only be called by a Founding Member called by a Member owning ten percent (10%) or more of the Ownership Interests of the LLC , upon the written consent of the Managers of the LLC and no more often than one time per week for no more than three consecutive weeks unless unanimously agreed to by all Founding Members. Meetings shall occur telephonically, and if possible via a videoconference, unless otherwise agreed upon by the Founding Members.

. (b)  Notwithstanding Section 5.4(a), a majority of the Members, including a Key Holder (of each Founding Member) shall meet, in person, at least quarterly, such quarterly meetings to be scheduled on a rolling basis at least two quarters in advance (or specified as a particular date, e.g., first Tuesday of any calendar quarter).

Majority Defined. As used throughout this agreement the term **"Majority"** of the Members shall mean a majority of the Ownership Interest of the LLC as determined by the records of the LLC on the date of the action.

Super Majority Defined. As used throughout this agreement the term **"Super**

Majority" of the Members shall mean a super majority of the Ownership Interest of the LLC as determined by the records of the LLC on the date of the action in excess of 65% interest.

**ARTICLE VI**

**DUTIES AND LIMITATION OF LIABILITY MEMBERS, OFFICERS; AND INDEMNIFICATION**

. 6.1  Duties of Members: Limitation of Liability. The Members, Managers and officers shall perform their duties in good faith.

. 6.2  Protection of Members and Managers.

.  (a)  As used herein, the term "Protected Party" refers to the Members and Managers of the LLC.

.  (b)  To the extent that, at law or in equity, a Protected Party has duties (including fiduciary duties) and liabilities relating thereto to the LLC or to any other Protected Party, a Protected Party acting under this Agreement shall not be liable to the LLC or to any other Protected Party for good faith reliance on:

.    (i)  the provisions of this Agreement;

.    (ii)  the records of the LLC; and/or

.    (iii)  such information, opinions, reports or statements presented to the LLC by

.   any person as to matters the Protected Party reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the LLC, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of 6.3 Indemnification and Insurance. (a) The Company shall indemnify and hold harmless the

. (i)  Officers,

. (ii)  the Company's employees (the "Employees"),

. (iii)  the Managers and

 (iv) except as set forth in Section 4.2(c), the Members and their agents and/or their legal representatives, Employees and each other Person who may incur liability as a Member or otherwise in connection with the management or ownership of the Company (each, an **"Indemnified Party"**), against all liabilities and expenses (including amounts paid in satisfaction of judgments, in compromise, as fines and penalties, and as counsel fees) reasonably incurred by him, her or it in connection with the investigation, defense or disposition of any action, suit or other proceeding, whether civil or criminal, in which any Indemnified Party may be involved or with which he, she or it may be threatened, while an Officer, Employee or a Member or serving in such other capacity or thereafter, by reason of him, her or it being or having been an Officer, Employee or a Member, or by serving in such other capacity, except with respect to any matter that constitutes willful misconduct, bad faith, gross negligence or reckless disregard of the duties of his or her office, or criminal intent. The Company shall have the right to approve any counsel selected by any Indemnified Party and to approve the terms of any proposed settlement. The rights accruing to any Officer, Employee or a Member and each other Indemnified Party under this Section 6.4 shall not exclude any other right to which he, she or it may be lawfully entitled; provided that any right of indemnity or reimbursement granted in this Section 6.4 or to which any Indemnified Party may be otherwise entitled may only be satisfied out of the assets of the Company, and no Officer, Employee or Member shall be personally liable with respect to any such claim for indemnity or reimbursement. Notwithstanding any of the foregoing to the contrary, the provisions of this Section 6.4 shall not be construed so as to provide for the indemnification of an Officer, Employee or Member or any other Indemnified Party for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law (including any insolvency laws) or such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section 6.4 to the fullest extent permitted by law.

. (b)  Insurance. The Founding Members may cause the LLC to purchase and maintain insurance for the LLC, for its Members and Manager, and/or on behalf of any third party or parties whom the Members might determine should be entitled to such insurance coverage; provided, however, that the coverage limit for the LLC's managers and officers insurance shall not be

less than $1MM (One Million Dollars). The LLC shall also acquire E&O insurance when the first commercial agreement for launch of STARDOM, other than a pilot agreement, with a customer.

## ARTICLE VII  CONFIDENTIALITY/NON-COMPETITION

7.1 Confidentiality. All Members, Managers and Employees of LLC will execute Confidentiality Invention Assignment Agreements in the form set forth as Exhibit F.

7.2 Non-Competition/Non-Solicitation. So long a Party is a Member of the LLC, it will be prohibited from directly or indirectly competing with LLC.

## ARTICLE VIII

## RESTRICTIONS ON TRANSFERABILITY OF LLC INTEREST

. 8.1  LLC Interest. The LLC interest is personal property. A Member has no interest in the tangible or intangible property owned by the LLC.

. 8.2  Encumbrance. A Member may not encumber its LLC interest by pledging its LLC interest as a security interest or other form of collateral.

. 8.3  Sale or Transfer of Interest. No sale, transfer, assignment, pledge or other disposition of all or a portion of a Member's interests in LLC will be permitted without the prior written consent of Board Managers and Ciright (except for certain transfers to other Members or to Permitted Transferees), who may grant or withhold such consent in their sole and absolute discretion. No transfer or disposition of any interests in LLC will be permitted

. (a)  if such transfer or disposition, individually or in combination with other transactions, would result in the dissolution of LLC;

. (b)  without a favorable opinion of counsel satisfactory to the Board to the effect that the transfer or disposition is subject to an effective registration or exemption under applicable federal and state securities laws; and  (i) Requirements for a Third Party to Become a Member. A transferee of an LLC Interest pursuant to this Article VIII shall have no right to become a substitute Member with respect to the transferred LLC Interest unless all of the following

conditions are satisfied or waived by the remaining Members: an executed or authenticated copy of the written instrument of assignment or transfer is delivered to the LLC;

.      (c)  the transferee agrees to be bound by all of the terms of this Agreement by executing a counterpart signature page to this Agreement;

.      (d)  the LLC shall have obtained a favorable opinion of its counsel, at the sole cost and expense of the transferring Member, to the effect that after such transfer, the LLC will continue to be classified as a partnership for federal income tax purposes and not as an association taxable as a corporation;

.      (e)  the transferee has made payment to the LLC of all costs and expenses incurred as a result of its admission to the LLC; and

.      (f)  all the remaining Members have consented to the substitution of the transferee which consent may be withheld for any reason and for no reason.

.      (g)  Both the transferring Member and the transferee, upon request of the LLC, shall execute such further documents, instruments and certificates and perform such other acts as may be reasonably requested by the LLC from time to time in connection with the Transfer. The transferring Member shall further indemnify and hold the LLC and the nontransferring Members harmless from and against and with respect to any and all loss, damage, liability, obligation, costs or expense arising directly or indirectly form the Transfer.

.  (h)  Unless substituted for a Member under this Article VIII, and as permitted in Article XIII, a transferee shall have only the right to receive (i) the distributions of Distributable Cash and allocations of Profit and Loss that the transferring Member would have received, and (ii) the Distributable Cash attributable to the transferring Member's Capital and Ownership Interests. A transferee who does not become a substitute Member shall have no right (w) to participate in the management of the LLC, (x) to vote on actions of the LLC, (y) to inspect the books and records of the LLC, or (z) to cause a dissolution of the LLC.

.  (i) **"Permitted Transferees"** means

(A) with respect to any Member, any other Member or any controlled Affiliate of such Member that has as its principal business and purpose to acquire, hold, maintain, finance, manage or dispose of investments in other entities,

(B) with respect to any Member that is a limited partnership or general partnership or a limited liability company, any limited partner, general partner or member in connection with a distribution to limited partners, any general partner or member,

(C) with respect to any Member that is a trust, all the beneficiaries of such trust or the grantor of the trust, and

(D) with respect to any Member, any investment fund or vehicle for which such Member or any of its Affiliates acts as an investment advisor or portfolio manager.

8.4 Involuntary Transfer of a Membership Interest. A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest, shall constitute a material breach of this Agreement by such Member.

## ARTICLE IX DISSOLUTION

9.1 Termination of LLC.

(a) LLC will be dissolved and its affairs wound up upon

.  (i)  the occurrence of events specified in this Agreement;[1]

. (ii)  the written consent of all the Founding Members;

. (iii)  an event of withdrawal with respect to a Founding Member, unless

the business of LLC is continued by the remaining Founding Member within 90 days; or

. (iv)  a decree of judicial dissolution.

. (v)  insolvency

(b) Upon dissolution, LLC will cease carrying on the Business and will begin the process of winding up and liquidation; payments to creditors; establishing reserves; and payment to Members of any remaining amounts in accordance with their respective capital accounts.

9.2 Final Distributions. Upon the winding up of the LLC, the assets must be distributed as follows:

(a)  to the LLC creditors; and

(b)  to Members in accordance with the provisions of Section 4.6 of this Agreement.

### ARTICLE X  TAX MATTERS

. 10.1  Capital Accounts. Capital accounts shall be maintained consistent with Internal Revenue Code § 704 and the regulations thereunder.

. 10.2  Tax Matters Partner. The Members hereby designate *BOARD MANAGERS* as the "tax matters partner" for purposes of representing the LLC before the Internal Revenue Service if necessary. The Founding Members shall mutually agree upon an independent certified public accountant firm to audit the LLC's financial statements and to provide other services to the LLC, failing which, *Board Managers* shall appoint a nationally-respected firm that does not have a conflict of interest with Ciright.

. 10.3  Partnership Election. The Members elect that the LLC be taxed as a partnership and not as an association taxable as a corporation.

### ARTICLE XI - RECORDS AND INFORMATION

Records and Inspection. The LLC shall maintain at its place of business or such other place as may be designated by the Manager, the Articles of Organization, any amendments thereto, this Agreement, and all other LLC records required to be kept by the Act, and the same shall be subject to inspection and copying at the reasonable request, and the expense, of any Member.

(c)  other information regarding the affairs of the LLC as is just and reasonable.

## ARTICLE XII  REPRESENTATIONS AND WARRANTIES

Representations and Warranties of the Members. Each Member represents and warrants to the LLC and the other Members that such Member:

. (a) has sufficient financial strength to hold the Member's Membership Interests in the LLC as an investment and bear the economic risks of that investment (including possible complete loss of such investment);

. (b) at the time he, she or it became a Member had a pre-existing personal or business relationship with the LLC or one or more of its Members, or by reason of his, her or its business or financial experience, or by reason of the business or financial experience of his, her or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the LLC or any Affiliate of the LLC, is capable of evaluating the risks and merits of an investment in the LLC and of protecting his, her or its own interests in connection with this investment;

. (c) has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the LLC's sale to such Member of his, her or its Membership Interests;

. (d) has acquired his or its Membership Interests in the LLC for his, her or its own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof; and no other Person will have any direct or indirect beneficial interest in or right to such Membership Interests;

. (e) has no contract, undertaking, understanding, agreement, or arrangement, formal or informal, with any Person to sell, transfer, or pledge all or any portion of his, her or its Membership Interests in the LLC; and has no current plans to enter into any such contract, undertaking, understanding, agreement, or arrangement;

. (f) has been afforded full and complete access to the books, financial statements, records, contracts, documents and other information concerning the LLC and its proposed activities,  and has been afforded an opportunity to ask such questions of the LLC's agents, accountants and other representatives concerning the LLC's proposed business,

operations, financial condition, assets, liabilities and other relevant matters as he has deemed necessary or desirable, and has been given all such information as has been requested, in order to evaluate the merits and risks of the investment contemplated herein;

. (g) upon execution of this Agreement and immediately prior to each Capital Contribution, satisfies the requirements of an "accredited investor" as such term is used in Rule 501(a) promulgated under the Securities Act;

. (h) is duly incorporation, qualification, and authorization to enter into the joint venture, has exclusive ownership of the assets being contributed to LLC free of any lien, security interest, infringement, or adverse claim,

. (i) attests to the accuracy and adequacy of the statements made in the patent filings that underlie the Licenses, and

. (i) to their knowledge, no additional intellectual property is necessary to effectuate the Business; and

. (j) has all right title and interest in all of the Capital Contributions, not subject to any liens or other encumbrances.

12.2 Indemnification. Each Party will agrees to indemnify and hold harmless the other Party and the LLC for any losses or liabilities arising from any breach of any representation or warranty in accordance with Article VI.

**ARTICLE XIII**

**MISCELLANEOUS PROVISIONS**

. 13.1  Amendment. Except as otherwise provided in this Agreement, a Founding Member may propose any amendment to this Agreement.

. 13.2  Applicable Law. To the extent permitted by law, this Agreement shall be construed in accordance with and governed by the laws of the State of Florida.

. 13.3  Disputes Among Members.

(a) Member Disputes.

(i) The Members agree that in the event of any dispute or dispute arising out of

or in connection with this Agreement by good-faith negotiation and mutual agreement.

(ii) However, in the event that the Members are unable to resolve any Member Dispute, such parties shall first attempt to settle such dispute through a non-binding mediation proceeding. In the event any party to such mediation proceeding is not satisfied with the results thereof, then any unresolved disputes shall be finally settled in accordance with an arbitration proceeding.

(b) Mediation.

(i) Mediation proceedings shall be conducted in accordance with the Commercial Mediation Rules of the American Arbitration Association (the **"AAA"**) in effect on the date the notice of mediation was served, other than as specifically modified herein, and shall be non-binding on the parties thereto.

(ii) Any Member may commence a mediation proceeding by serving written notice thereof to the other Members, by mail or otherwise, designating the issue(s) to be mediated and the specific provisions of this Agreement under which such issue(s) and dispute arose. The initiating party shall simultaneously file two copies of the notice with the AAA, along with a copy of this Agreement. A Member may withdraw from the Member Dispute by signing an agreement to be bound by the results of the mediation, to the extent the mediation results are accepted by the other Members as provided herein. A Member who withdraws shall have no further right to participate in the Member Dispute.

(iii) The Members shall select one neutral third party AAA mediator (the "Mediator") with expertise in the area that is in dispute. If a Mediator has not been selected within five (5) business days thereafter, then a Mediator shall be selected by the AAA in accordance with the Commercial Mediation Rules of the AAA.

(iv) The Mediator shall schedule sessions, as necessary, for the presentation by all Members of their respective positions, which, at the option of the Mediator, may be heard by the Mediator jointly or in private, without any other members present. The mediation proceeding shall be held in the city that is the LLC's principal place of business or such other place as agreed by the Mediator and all of the Members. The Members may submit to the Mediator, no later than ten (10) business days prior to the first scheduled session, a brief memorandum in

support of their position.

(v) The Mediator shall make written recommendations for settlement in respect of the dispute, including apportionment of the mediator's fee, within ten (10) business days of the last scheduled session. If any Member involved is not satisfied with the recommendation for settlement, he may commence an arbitration proceeding.

(c) Arbitration.

(i) Arbitration proceedings shall be conducted under the Rules of Commercial Arbitration of the AAA (the "Rules"). A Member may withdraw from the Member Dispute by signing an agreement to be bound by the results of the arbitration. A Member who withdraws shall have no further right to participate in the Member Dispute.

 (ii) The arbitration panel shall consist of one arbitrator. The Members shall select one neutral third party AAA arbitrator (the "Arbitrator") with expertise in the area that is in dispute. If an Arbitrator has not been selected within five (5) business days thereafter, then an Arbitrator shall be selected by the AAA in accordance with the Commercial Arbitration Rules of the AAA. The arbitration proceeding shall be held in the city that is the LLC's principal place of business or such other place as agreed by the Arbitrator and all of the Members. Any arbitrator who is selected shall disclose promptly to the AAA and to both parties any financial or personal interest the arbitrator may have in the result of the arbitration and/or any other prior or current relationship, or expected or discussed future relationship, with the Members or their representatives. The arbitrator shall promptly conduct proceedings to resolve the dispute in question pursuant to the then existing Rules. To the extent any provisions of the Rules conflict with any provision of this Section, the provisions of this Section shall control.

(iii) In any final award and/or order, the arbitrator shall apportion all the costs (other than attorney's fees which shall be borne by the party incurring such fees) incurred in conducting the arbitration in accordance with what the arbitrator deems just and equitable under the circumstances.

(iv) Discovery shall not be permitted in such arbitration except as allowed by the rules of arbitration, or as otherwise agreed to by all the parties of the Member Dispute. Notwithstanding, the Members agree to make available to one

another and to the arbitrator, for inspection and photocopying, all documents, books and records, if determined by the arbitration panel to be relevant to the dispute, and by making available to one another and to the arbitration panel personnel directly or indirectly under their control, for testimony during hearings if determined by the arbitration panel to be relevant to the dispute. The Members agree, unless undue hardship exists, to conduct arbitration hearings to the greatest extent possible on consecutive business days and to strictly observe time periods established by the Rules or by the arbitrator for the submission of evidence and of briefs. Unless otherwise agreed to by the Members, a stenographic record of the arbitration proceedings shall be made and a transcript thereof shall be ordered for each Member, with each party paying an equal portion of the total cost of such recording and transcription.

(v) The arbitrator shall have all powers of law and equity, which it can lawfully assume, necessary to resolve the issues in dispute including, without limiting the generality of the foregoing, making awards of compensatory damages, issuing both prohibitory and mandatory orders in the nature of injunctions and compelling the production of documents and witnesses for presentation at the arbitration hearings on the merits of the case. The arbitration panel shall neither have nor exercise any power to act as amicable compositeur or ex aequo et bono; or to award special, indirect, consequential or punitive damages. The decision of the arbitration panel shall be in written form and state the reasons upon which it is based. The statutory, case law and common law of the State of Florida shall govern in interpreting their respective rights, obligations and liabilities arising out of or related to the transactions provided for or contemplated by this Agreement, including without limitation, the validity, construction and performance of all or any portion of this Agreement, and the applicable remedy for any liability established thereunder, and the amount or method of computation of damages which may be awarded, but such governing law shall not include the law pertaining to conflicts or choice of laws of Florida; provided however, that should the parties refer a dispute arising out of or in connection with an ancillary agreement or an agreement between some or all of the Members which specifically references this Article, then the statutory, case law and common law of the State whose law governs such agreement (except the law pertaining to conflicts or choice of law) shall govern in interpreting the respective rights, obligations and liabilities of the parties arising out of or related to the transactions provided for or contemplated by such agreement, including, without limitation, the validity, construction and performance of all or any portion of such agreement, and the applicable remedy for any liability

established thereunder, and the amount or method of computation of damages which may be awarded.

(vi) *Any action or proceeding subsequent to any Award rendered by the arbitrator in the Member Dispute, including, but not limited to, any action to confirm, vacate, modify, challenge or enforce the arbitrator's decision or award shall be filed in a court of competent jurisdiction in the same county where the arbitration of the Member Dispute was conducted, and Florida law shall apply in any such subsequent action or proceeding.*

. 13.4  Counterparts. This instrument may be executed in any number of counterparts each of which shall be considered an original.

. 13.5  Specific Performance. Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which a Members may be entitled, at law or in equity, a Members shall be entitled to injunctive relief to prevent breaches of this Agreement and, specifically, to enforce the terms and provisions of this Agreement in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

. 13.6  Further Action. Each Member, upon the request of the LLC, agrees to perform all further acts and to execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

. 13.7  Method of Notices. All written notices required or permitted by this Agreement shall be hand delivered or sent by registered or certified mail, postage prepaid, or via reputable overnight carrier (2-day delivery or sooner) addressed to the LLC at its place of business or to a Member as set forth on the Member's signature page of this Agreement (except that any Member may from time to time give notice changing his address for that purpose), and shall be effective when personally delivered or, if mailed, on the date set forth on the receipt of registered or certified mail, or confirmed delivery by the reputable overnight carrier.

. 13.8  Electronic Communications. For purposes of this Agreement, any copy,

facsimile, telecommunication, email or other reliable reproduction of a writing, transmission or signature may be substituted or used in lieu of the original writing, transmission or signature for any and all purposes for which the original writing, transmission or signature could be used, provided that such copy, facsimile telecommunication or other reproduction shall have been confirmed received by the sending Party, except a Member must send a copy of any of the following notices via the methods set forth in Section 13.7: notices for breach, dissolution, Member expulsion, initiation of mediation or arbitration, settlements, and indemnification.

.  13.9  Computation of Time. In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

*SIGNATURE PAGE FOLLOWS*

**WHEREFORE,** the Parties have executed this Agreement on the year and date first above written.

**NOTICE: EACH MEMBER HEREBY CERTIFIES THAT HE OR SHE HAS RECEIVED A COPY OF THIS OPERATING AGREEMENT AND FORMATION DOCUMENT OF STARDOM CHANCE, LLC, A FLORIDA LIMITED LIABILITY COMPANY. EACH MEMBER REALIZES THAT AN INVESTMENT IN THIS LLC IS SPECULATIVE AND INVOLVES SUBSTANTIAL RISK. EACH MEMBER IS AWARE AND CONSENTS TO THE FACT THAT THE INTERESTS IN THE LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR SECURITIES ACT OF THE STATE OF FLORIDA. EACH MEMBER AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND THE FORMATION CERTIFICATE OR ARTICLES.**

| Founding Member | Founding Member |
|---|---|
| *[Board Manager]* | **CIRIGHT INC.** |

| | |
|---|---|
| By: _____ Name: Jeff Vanderpol<br><br>Title: CEO | By: _____<br>Joseph M. Callahan<br><br>Title: CEO |
| Founding Member<br><br>*[Joseph Callahan]*<br><br>By: _____ Name:<br>Joseph M Callahan<br><br>Title: Member | Founding Member<br><br>**TBD (CFO)**<br><br>By: _____<br><br>**Name: TBD**<br><br>Title: CFO |
| Founding Member<br><br>*TBD (CMO)*<br><br>By: _____<br><br>**Name: TBD**<br><br>Title: CMO | Founding Member<br><br>**TBD (COO)**<br><br>By: _____<br><br>**Name: TBD**<br><br>Title: COO |

**SCHEDULE 1**

**Member**

**Jeff Vanderpol Ciright, Inc. Joseph Callahan CMO – To Be Named $1 CFO – To Be Named $1 COO – To Be Named $1**

_____

**Cash (Cash Equivalent) Capital Contribution**

**Member Agreed Ownership Interest**

**62% 25% 1% (Non Dilatable) 4% 4% 4%**

**$ 1 $ 9,000,000 $ 65,000.00**

**EXHIBIT A OF STARDOM CHANCE**

**New Co, LLC OPERATING AGREEMENT**

Discounted Ciright Services and Timeline for Delivery to Stardom Chance, LLC

As defined in subparagraph 4.2(b)(i) of **ARTICLE IV CONTRIBUTIONS, PROFITS, LOSSES, AND DISTRIBUTIONS** Ciright and STARDOM, unless the parties enter into a separate Solutions Development Agreement to develop the software and hardware the will be the commercialized solution STARDOM shall sell in the marketplace. This agreement shall cover:

*Software* – Including Systems Analysis, Database Administration, Embedded Software Engineering, Network Architecture, Network Engineering, Big Data Analytics Engineering, Web Services, API integration, Java Engineering Development, Environmental Wireless Peer-to-Peer Network Design, Environment Application Analytics Engine

*User Interface and Experience Design* – Including Web Application User Interface Design, Android Application UI Design, iOS Application UI Design, Windows Application UI Design,

_____

# **Exhibit C**



Gar Giles <gar.g@ciright.com>

---

## Stardom Chance NFTs Proof of Purchase

**Jason Gwynn** <jason.gwynn@simplifiedpayments.com>                          5 October 2022 at 09:05
To: Shane Staret <sstaret@ciright.com>, Joe Babin <joe.babin@simplifiedpayments.com>
Cc: Ankit Mekwan <amekwan@ciright.com>, Gar Giles <gar.g@ciright.com>, Joseph Callahan
<jmpcallahan@ciright.com>

Good Morning Shane …


In order to initiate the dispute process this information needs to be uploaded to the TRX online reporting tool. When you open the chargeback record, there is an option to upload these documents to the corresponding chargeback. Review each Chargeback and upload the appropriate requested documentation. TRX will then send the information over to the network to initiate the process.


Happy to walk it through with you if you have any questions. Thanks



**Jason J. Gwynn**

**Simplified Payments, Inc.**

**(302) 584-0549**

[Quoted text hidden]

# Exhibit D

**Stardom Chance**
**Development Man Hours**
**Blended Billable Hourly Rate          $55**

| | | |
|---|---|---|
| Jan-22 | 2907 | $ 159,885 |
| Feb-22 | 2734 | $ 150,370 |
| Mar-22 | 3020 | $ 166,100 |
| Apr-22 | 2774 | $ 152,570 |
| May-22 | 2381 | $ 130,955 |
| Jun-22 | 2736 | $ 150,480 |
| Jul-22 | 2316 | $ 127,380 |
| Aug-22 | 1325 | $  72,875 |
| Sep-22 | 1215 | $  66,825 |

| YTD TOTAL | $ 1,177,440 |
|---|---|

## Stardom Chance Development Hours

**January 2022 (4 Weeks)**

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 201 |
| CTO Platform Architecture Hours (1) - | 119 |
| Platform Senior Design Engineer Hours (1) - | 76 |
| Senior Manager Technical Lead Hours (1) | 58 |
| Front End Angular JS Development Hours (3) - | 492 |
| Front End React JS Development Hours (4) - | 366 |
| MYSQL Data Base Development Hours (2) – | 94 |
| Python Development Hours (2) - | 106 |
| HTML Design Development Hours (3) – | 92 |
| JAVA Development Hours. (4) – | 188 |
| Node JS Development (2) - | 17 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 0 |
| Platform Analysts Hours (2) – | 132 |
| Business Analysis Hours (3) – | 482 |
| QA/QC Engineering Hours (3) – | 144 |
| Environment Testing Hours (3) – | 221 |
| Research and Development Hours (2) – | 111 |
| Contract Administration Hours (1) - | 8 |
| | |
| **Total January Development Man Hours** | **2907** |

## Stardom Chance Development Hours

### February 2022 (4 Weeks)

| | |
|---|---:|
| Front End UI UX Development Hours (1) - | 185 |
| CTO Platform Architecture Hours (1) - | 135 |
| Platform Senior Design Engineer Hours (1) - | 90 |
| Senior Manager Technical Lead Hours (1) | 85 |
| Front End Angular JS Development Hours (3) - | 340 |
| Front End React JS Development Hours (4) - | 332 |
| MYSQL Data Base Development Hours (2) – | 65 |
| Python Development Hours (2) - | 124 |
| HTML Design Development Hours (3) – | 80 |
| JAVA Development Hours. (4) – | 210 |
| Node JS Development (2) - | 35 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 0 |
| Platform Analysts Hours (2) – | 163 |
| Business Analysis Hours (3) – | 441 |
| QA/QC Engineering Hours (3) – | 158 |
| Environment Testing Hours (3) – | 205 |
| Research and Development Hours (2) – | 78 |
| Contract Administration Hours (1) - | 8 |
| **Total January Development Man Hours** | **2734** |

## Stardom Chance Development Hours

### March 2022 (5 Weeks)

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 235 |
| CTO Platform Architecture Hours (1) - | 145 |
| Platform Senior Design Engineer Hours (1) - | 92 |
| Senior Manager Technical Lead Hours (1) | 97 |
| Front End Angular JS Development Hours (3) - | 442 |
| Front End React JS Development Hours (4) - | 321 |
| MYSQL Data Base Development Hours (2) – | 50 |
| Python Development Hours (2) - | 90 |
| HTML Design Development Hours (3) – | 140 |
| JAVA Development Hours. (4) – | 190 |
| Node JS Development (2) - | 49 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 0 |
| Platform Analysts Hours (2) – | 176 |
| Business Analysis Hours (3) – | 463 |
| QA/QC Engineering Hours (3) – | 196 |
| Environment Testing Hours (3) – | 221 |
| Research and Development Hours (2) – | 105 |
| Contract Administration Hours (1) - | 8 |
| | |
| **Total January Development Man Hours** | **3020** |

## Stardom Chance Development Hours

**April 2022 (4 Weeks)**

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 210 |
| CTO Platform Architecture Hours (1) - | 118 |
| Platform Senior Design Engineer Hours (1) - | 76 |
| Senior Manager Technical Lead Hours (1) | 85 |
| Front End Angular JS Development Hours (3) - | 389 |
| Front End React JS Development Hours (4) - | 245 |
| MYSQL Data Base Development Hours (2) – | 40 |
| Python Development Hours (2) - | 85 |
| HTML Design Development Hours (3) – | 122 |
| JAVA Development Hours. (4) – | 210 |
| Node JS Development (2) - | 47 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 100 |
| Platform Analysts Hours (2) – | 167 |
| Business Analysis Hours (3) – | 432 |
| QA/QC Engineering Hours (3) – | 165 |
| Environment Testing Hours (3) – | 185 |
| Research and Development Hours (2) – | 90 |
| Contract Administration Hours (1) - | 8 |
| | |
| **Total January Development Man Hours** | **2774** |

## Stardom Chance Development Hours

### May 2022 (4 Weeks)

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 185 |
| CTO Platform Architecture Hours (1) - | 107 |
| Platform Senior Design Engineer Hours (1) - | 80 |
| Senior Manager Technical Lead Hours (1) | 92 |
| Front End Angular JS Development Hours (3) - | 225 |
| Front End React JS Development Hours (4) - | 207 |
| MYSQL Data Base Development Hours (2) — | 40 |
| Python Development Hours (2) - | 80 |
| HTML Design Development Hours (3) — | 111 |
| JAVA Development Hours. (4) — | 185 |
| Node JS Development (2) - | 55 |
| Salona Rust Programing Development Hours (1) — | 0 |
| Ethereum Blockchain Development Hours (2) - | 60 |
| Platform Analysts Hours (2) — | 152 |
| Business Analysis Hours (3) — | 401 |
| QA/QC Engineering Hours (3) — | 145 |
| Environment Testing Hours (3) — | 165 |
| Research and Development Hours (2) — | 83 |
| Contract Administration Hours (1) - | 8 |
| | |
| **Total January Development Man Hours** | **2381** |

## Stardom Chance Development Hours

**June 2022 (5 Weeks)**

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 235 |
| CTO Platform Architecture Hours (1) - | 144 |
| Platform Senior Design Engineer Hours (1) - | 94 |
| Senior Manager Technical Lead Hours (1) | 108 |
| Front End Angular JS Development Hours (3) - | 285 |
| Front End React JS Development Hours (4) - | 225 |
| MYSQL Data Base Development Hours (2) – | 40 |
| Python Development Hours (2) - | 80 |
| HTML Design Development Hours (3) – | 165 |
| JAVA Development Hours. (4) – | 201 |
| Node JS Development (2) - | 66 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 80 |
| Platform Analysts Hours (2) – | 152 |
| Business Analysis Hours (3) – | 401 |
| QA/QC Engineering Hours (3) – | 166 |
| Environment Testing Hours (3) – | 134 |
| Research and Development Hours (2) – | 80 |
| Contract Administration Hours (1) - | 80 |
| **Total January Development Man Hours** | **2736** |

## Stardom Chance Development Hours

### July 2022 (4 Weeks)

| | |
|---|---|
| Front End UI UX Development Hours (1) - | 168 |
| CTO Platform Architecture Hours (1) - | 122 |
| Platform Senior Design Engineer Hours (1) - | 90 |
| Senior Manager Technical Lead Hours (1) | 110 |
| Front End Angular JS Development Hours (3) - | 295 |
| Front End React JS Development Hours (4) - | 205 |
| MYSQL Data Base Development Hours (2) – | 40 |
| Python Development Hours (2) - | 80 |
| HTML Design Development Hours (3) – | 122 |
| JAVA Development Hours. (4) – | 88 |
| Node JS Development (2) - | 86 |
| Salona Rust Programing Development Hours (1) – | 0 |
| Ethereum Blockchain Development Hours (2) - | 110 |
| Platform Analysts Hours (2) – | 140 |
| Business Analysis Hours (3) – | 310 |
| QA/QC Engineering Hours (3) – | 120 |
| Environment Testing Hours (3) – | 110 |
| Research and Development Hours (2) – | 40 |
| Contract Administration Hours (1) - | 80 |
| **Total January Development Man Hours** | **2316** |

8/29/22

Ciright, Inc.
7 Union Hill Road
West Conshohocken, PA 19428

**Stardom Chance, LLC**
**Deliver via Electronic Email**
**JEFF@STARDOMCHANCE.COM**

**RE: Technology Equity Partnership Deficiency Notice**

**Prepared By:** Ciright, Inc. Board of Directors – Mike Conway Chair TE Holding Committee, and
Gar Giles Portfolio Company Manager.

**ATTN: Mr. Vanderpol**

This letter serves as formal notice of deficiency of commitments by Jeff Vanderpoll CEO,
Stardom Chance, LLC (Stardom)

This is the formal position of the Ciright, Inc. (Ciright) Board of Directors as agreed to in the
August 22, 2022 Annual Board meeting.

The contractual relationship between Ciright and Stardom is in need of immediate attention
and course correction to resolve the major business deficiencies.

The deficiencies verified include but are not limited to the neglect of proficient business
management, the lack of integrity from failed commitments, and financial irresponsibility.

This is the formal notice that Stardom Chance shall expeditiously correct these deficiencies.  It is
recommended that a business manager be contracted to manage all business documentation.
Additionally, it is recommended that a and financial manager be contracted to manage all
expense distributions. Ciright reserves the right to approve each of these representative.

Ciright has assigned this matter to Mr. Gar Giles, Ciright portfolio company manager.  Mr. Giles
has been tasked to work through supporting the stardom launch and resolve the outstanding
deficiencies.

As an additional matter of relevance to the liabilities Mr. Vanderpol has to Ciright the reference
to the Planet Hunny business which has defaulted on its financial obligations to Ciright.  This
default is in excess of $400,000.

It is a further the result of the items detailed above along with the haphazardness and consistent business change in direction that any additionally development or creative services shall be provided to Stardom or Mr. Jeff Vanderpol without formal scope, a defined timeline, and financial terms.

Ciright is committed to ensuring Stardom's success.  This is and has been demonstrated by the enormous technology and creative support for the applications UI UX along with the business operating system to manage the enterprise.  We respectfully request the contractual documentation of the formal relationship as soon as possible.


Sincerely,
Mike Conway



Ciright, Inc.
Chairman Technology Equity Partnerships

# RED TEXT HIGHLIGHTS THE DOCUMENTATION VERIFIED BY THE CIRIGHT BOD AND THE FORMAL BREACH OF COMMITMENTS BY JEFF VANDERPOL

# EMAIL AGREEING TO ALL THE FOLLOWING TERMS ALSO ATTACHED.

**MEMBERSHIP AGREEMENT PROVIDED FOR SIGNITUR AND EXECUTION HAS BEEN IGNORED**

- AGREEMENT SENT VIA DOCUSIGN NEVER SIGNED 7/7/2022

BELOW IS THE AGREED UPON TERMS OF THE LLC IN BLACK AND THE SPECIFIC AREAS IN RED ADDED FOR SPECIFIC IDENTIFICATION OF BREACH.

**1. $25,000 Reality Show Celebrity Recruiting Budget. Agreed once milestones are meet:**
- 0 Stardom Web Application Must Be Launched
- 0 Script Writing Contest Closed - 450 Applicants
- 0 1500 community members have joined
- 0 Script Writing Reviewers and Judges Engine Running
- 0 Directors Contest Launched - Need the Fields for their submission
- **D Company Community Membership Launched**
- 0 Maria Bravo and Eva Longoria Contracted and a member of the team
- detailed budget for aspen trip to be provided along with daily tentative agenda and target celebrities to prepare background diligence for each encounter
- 0 reality TV show LLC formation - Along with Equity agreement for parent , JMC, and Celebrity Strategy.
- 0Stardom Chance Realty TV LLC
- founders stardom Chance and Joe Callahan ? Any others defined at this time ? Jeff Individually?
- 0 what is to be the set company valuation prior to approaching celebrity ?
- 0 company formed prior is a requirement
- 0 documents must be digital and prepared for electronic signatures at the impulse of decision
- all judges to receive equity ?
- o judge ecosystem reach and personal wealth analysis is required
- 0 release of funds predicated on JMC approval of the celebrity and the associated terms
- 0 comprehensive list of A, B, and C Celebrities we will be meeting with in Aspen

- Non union film and show production staff market concerns solution to the problem

- $300,000 cash capitalization contingent on all the above and milestone achievements at sole discretion of JMC

**2. $65,000 operational budget paid in 3 payments - February , March , April**

- Full over-site and approval of expenses

BANK ACCESS HAS NOT BEEN PROVIDED

COMMITMENT HAS NOT BEEN MEET, ALL EXPENSES HAVE BEEN SPENT AND NOT APPROVED BY JOSPEH CALLAHAN AS AGREED

# - contract admin support must be hired

HAS NOT BEEN MEET THE REQUIREMENTS, IN FACT SINCE JEFF WAS DEFICIENT IN FULFILLING THIS RESPONSIBILITY CIRIGHT IDENTIFED AND RELEASED FLORINA HANDEL TO PERFORM TEHSE THE TASKS OF CONTRACT ADMINISTRATION, INFLUENCER CONTARCT DOCUMENTAION, TERM SHEET PREPERATION, AND NFT MANUALLY CONTRACT PROCESSING.

JEFF HAS REFUSED TO PAY FOR TEHSE SERVICES AFTER THEY HAVE BEEN RENDERED.  FURTHERMORE, JEFF AGREED TO PAY THESE FEES AFTER A BUDGET APPROVAL MEETING WITH JOHN ZULK AND JOHN CARSON STARDOM BOARD MEMBERS.

IT IS NOTED THAT THE FUNDS WERE AVAILABLE AND CONFIRMED IN THE CASH BALANCE AT THE TIME OF APPROVED COMMITMENT.

- company contract word smith writer must be hired , to be the reviewer of all content , daily activity part time position
- PR firm contract
- Editor Writer Support

JEFF HIRED TWO FIRMS AND BOTH FAILED TO EXECUTE WITH ANY MEANINGFUL EFFECTIVENESS TO PROMOTE STARDOM.

**3. Executive Team Recruiting Requirement**
- Head Hunter to be immediately Contracted
- 3 Positions to be identified and candidates gathered
- CFO

- COO
- CMO
- all to be listed as co-founders
- 4 percent equity held in escrow for each position
- competitor annul salary post funding
- possible each significant investors as well
- All positions to be filled for May / June / July Start Date

<span style="color:red">JEFF HAS NOT HAD A SINGLE MEETING WITH ONE RECRUITING FIRM TO IDENTIFY THE NECESSARY HUMAN CAPITAL EXECUTIVES.</span>

**4. Public Relations and Media Firm Contract**

- must be in place prior to February 1st Payment of operational funding

**5. Upon 8 million dollars in funding a new CEO t**o be recruiter to run the overall operations andJeff to lead specific defined activities as Chief Revenue Officer and ? Creative title do we drive through The market. Need to get Jeff focused where his strengths are. Driving strategic partnerships , sponsorships , expanding community , and film strategies.

<span style="color:red">NOT APPLICAABLE ATT THIS TIME</span>

**6. Technology Stack**
- ciright perpetual software license
LICENSE
- access to complete ciright stack of applications
- **all technology decisions by Ciright CTO**
- technology roadmap exclusively by Joe Callahan Founder, until such time as agreed to turn over to others.
- new web application development services
- UI UX design services
- digital business serves
- managed services (n**o *cash requirement until business operations scale requires costs for bandwidth , cpu usage , data storage , compute memory , node connections , and operational manpower)***
- comprehensive over-site and approval of any loyalty points or currency and or rewards programs for services.
- **crypto currency roadmap approval for all integrated services offerings**

One year commitment of services above to get company fully operational without any Cashflow burden with exception of managed services in the event of immediate exponential growth

OPERATIONAL MANPOWER AND UTILITY COSTS HAVE NIOT BEEN PAID, THEY HAVE BEEN INVOCIED AND ACCRUED BY CONTRACTED THIRD PARTY AMBIMAT.

**7. Immediate requirement - hire a PR firm ,**
- firms identified and contacted asap
- interviewing to be commence early February
- engagement contract signed by February 21st
- budget to be defined and mutually agreed

HAS NOT OCCURERD TWO FAILED CONTRACTS AND NOTHING IN RETURN

**8. Cap Table**
- Ciright, Inc. 25 % Founders Equity
- Joe Callahan 1 % Founders Non Dilutive Equity
- CMO - 4 % Equity in escrow

- CFO - 4 % Equity in escrow

- COP - 4 % Equity in escrow
- JV - Balance of Equity and his structured agreements

**9. Legal Documents Required**

- Company Organization Filings
- Membership Agreement
- Operating Agreement
- Software License Agreement
- Preparation for C Corp Conversion

STILL WAITING ON MEMBERSHIP / OPERATING AGREEMENT SIGNATURES

**10. Company Financial Management Details**
- 2021 Financial Expenses List ALL CHECK AND CARD CHARGE DETAIL
- 2021 Cash deposit and funds source

- 2022 YTD Expenses

- 2022 Recurring Expenses
- 2022 Planned Expenses

FINANCIAL INFORMATION HAS NOT BEEN PROVIDED, NO STATEMENTS, NO BANK ACCESS, NO REPORTS, NOTHING AFTER MULTIPLE ORAL AND WRITTEN REQUESTS

**11. Family Office outreach**
- Once reality TV show is committed and celebrity judge terms are finalized we will approach the family office for entertainment investors with third party prepared financial proforma and business plan and capital documentation

NOT APPLICIABLE AT THIS TME MILESTONE UNATAINED.

**12. Equity sale terms for future rounds** , definition around percentages of equity each party may offer to sell at capitalization rounds.
- Investment Banker Must Be Contacted

INVESTMENT BANKER HAS NOT BEEN CONTACTED OR IDENTIFIED .

**13. Awareness of JV daily call plan to w sure highest priority most important goals are focus of activity**

JEFF HAS BEEN INCONSISTANT WITH DOCUMENTING DAILY CALLS , APPROXIMATLY 25% OF HIS DAYS CALLS ARE DOCUMENTED.

**14. Goal management system established with measurable milestones and active reporting**

JEFF HAS REFUSED TO ACCEPT AND APPLY PROFESSIONAL MENTORSHIP AND COACHING TO DEFINE GOALS AND WORK TO ACHIEVE THE GOLS AND MEASURE THE DAILY PROGRESS.



Capital Agreement Details

Joseph Callahan <jmjcallahan@cright.com>
to Jeff

Jeff ,

Below are the details as we agreed:

1. $25,000 Reality Show Celebrity Recruiting Budget. Agreed once milestones are meet:
- Stardom Web Application Must Be Launched
- Script Writing Contest Closed - 450 Applicants
- 1500 community members have joined
- Script Writing Reviewers and Judges Engine Running
- Directors Contest Launched - Need the Fields for their submission
- Company Community Membership Launched
- Maria Bravo and Eva Longoria Contracted and a member of the team
- detailed budget for aspen trip to be provided along with daily tentative agenda and target celebrities to prepare background diligence for each encounter
- reality TV show LLC formation - Along with Equity agreement for parent , JMC, and Celebrity Strategy.
- Stardom Chance Realty TV LLC
- founders stardom Chance and Joe Callahan ? Any others defined at this time ? Jeff Individually ?
- what is to be the set company valuation prior to approaching celebrity ?
- company formed prior is a requirement
- documents must be digital and prepared for electronic signatures at the impulse of decision
- all judges to receive equity ?
- judge ecosystem reach and personal wealth analysis is required
- release of funds predicated on JMC approval of the celebrity and the associated terms.
- comprehensive list of A, B, and C Celebrities we will be meeting with in Aspen
- Nonation film and show production staff market concerns solution to the problem
- $300,000 cash capitalization contingent on all the above and milestone achievements at sole discretion of JMC

2. $65,000 operational budget paid in 3 payments - February , March , April
- Full over-site and approval of expenses
- contract admin support must be hired
- company contract word smith writer must be hired , to be the reviewer of all content , daily activity part time position
- PR firm contract
- Editor Writer Support

3. Executive Team Recruiting Requirement
- Head Hunter to be Immediately Contracted
- 3 Positions to be identified and candidates gathered
- CFO
- COO
- CMO
- all to be listed as co-founders
- 4 percent equity held in escrow for each position
- competitor annul salary prior funding
- possible each significant investors as well
- All positions to be filled for May / June / July Start Date

4. Public Relations and Media Firm Contract
- must be in place prior to February 1st Payment of operational funding

5. Upon 8 million dollars in funding a new CEO to be recruiter to run the overall operations andJeff to lead specific defined activities as Chief Revenue Officer and ? Creative title do we drive through The market. Need to get Jeff focused where his strengths are. Driving strategic partnerships , sponsorships , expanding community , and film strategies.

6. Technology Stack
- cright perpetual software license
- access to complete cright stack of applications
- all technology decisions by Cright CTO
- technology roadmap exclusively by Joe Callahan Founder, until such time as agreed to turn over to others.
- new web application development services
- all UX design services
- digital busines server
- managed services (no cash requirement until busines operations scale requires costs for bandwidth , cpu usage , data storage , compute memory , node connections , and operational manpower)
- comprehensive over-site and approval of any loyalty points or currency and or rewards programs for services.
- crypto currency roadmap approval for all integrated services offerings
One year commitment of services above to get company fully operational without any Cashflow burden with exception of managed services in the event of immediate exponential growth

7. Immediate requirement - hire a PR firm ,
- firms identified and contract asap
- interviewing to be commence early February
- engagement contract signed by February 21st
- budget to be defined and mutually agreed

8. Cap Table
- Cright, Inc. 25 % Founders Equity
- Joe Callahan 1 % Founders Non Dilutive Equity

- CMO - 4 % Equity in escrow
- CFO - 4 % Equity in escrow
- COP - 4 % Equity in escrow
- JV - Balance of Equity and his structured agreements

9. Legal Documents Required
- Company Organization Filings
- Membership Agreement
- Operating Agreement
- Software License Agreement
- Preparation for C Corp Conversion

10. Company Financial Management Details
- 2021 Financial Expenses List ALL CHECK AND CARD CHARGE DETAIL
- 2021 Cash deposit and funds source
- 2022 YTD Expenses
- 2022 Recurring Expenses
- 2022 Planned Expenses

11. Family Office outreach
- once reality TV show is committed and celebrity judge terms are finalized we will approach the family office for entertainment investors with third party prepared financial proforma and business plan and capital documentation

12. Equity sale terms for future rounds , definition around percentages of equity each party may offer to sell at capitalization rounds.
- Investment Banker Must Be Contacted

13. Awareness of JV daily call plan to w sure highest priority most important goals are focus of activity

14. Goal management system established with measurable milestones and active reporting

↩ Reply    ↪ Forward

===================================================================

Stardom Operations Meeting Agenda

Meeting Completed 6/24/22

# 1. Historical Financial Review (20 Minutes)

- *a. Current Cash*

- Expected Cash receipts amount and date

- YTD Cash Receipts

- YTD Cash expense by party paid

- YTD Jeff Stock Sold and JV Cash Receipt

JEFF HAS SUPPLIED NONE OF THE INFORMATION HE AGREED TO PROVIDE

Meeting Notes:

Current Cash Position and 3 month budget

$42.000 Cash

$30,000 so far from Peter

$12,600 Balance Forth Coming

Should Net $75,000

$87,500 cash balance

***-b. 90 Day Cashflow Budget***

- Whom - Reason - Amount - date

- Revenue from source and date

July - August - September

$29,200 Available / Month

- $7,000 Jeff

- $4000 Florina (Contract Administration)

- $4500 (3 - Ambimat - BA Business Analyst) (AMBIMAT)

- $750 Ciright Network Managed Services (CIRIGHT US)

Ambimat Invoices July

Ambimat Invoices August

Ambimat Invoices September

- $2000 Florina (? Editor / Wordsmith /Social Media content final approval)

- $1200 EMAIL CAMPAIGN Operator (? AMBIMAT)

- $1200 SOCIAL MEDIA Channel Operator (? AMBIMAT)

- $1200 CRM Data Administrator (? Ambimat)

*$25,150 Budget / Month*

***Remaining Monthly Balance - $4316 / Month***

- $ Digital Social Advertising

- $ ? Email Campaign Service Provider API

- $ AI Stardom Site Chat Bots

- $ Twillio

- $ AWS

- $ Meeting Audio Transcription Service

- $ Bandwith AWS

- $ Storage Capacity AWS S3

- $ CPU Usage

- $ VOIP Service

- $ Additional Budegt Items

- $2000 Funds to Free For Videos


**–c. Future budget human capital**

- salaries

- contractors

- interns

- services


**2. Social Media Accounts**

a. Facebook

b. Instagram

c. Twitter

d. TicTok

e. LinkedIN

f. Management Bucket Responsibilities and Associated Costs to Administrate

**Buckets of Responsibilities**

f1. account security management - NEEL

f2. content creation - RICH

f3. wordsmith and messaging - FLORINA

f4. campaigns and timing - JEFF / NEEL

f5. machine automation bots for likes- NEEL

f6. communication monitoring - NEEL

f7. comment monitoring - NEEL

NEEL TO REVIEW

**g. Email Campaign Creation and Management Requirements**

g1. template creation RICH

g2. template html coding and integration RICH / DUVAL

g3. template campaigns

g4. embedded element logic

g5. analytics NEEL

g6. spam protection NEEL

g7. domain protection NEEL

g8. outbound email account (do_not_reply@stardomchance.com)

## 3. Team Member Review (15 Minutes)

- Inactive Stake Holders

- Active Stake Holders

- Target Ambassadors

- Target Influencers

- Historical Time Committed

- Future Time Commitments

- Historical Stakeholder Liabilities

## 4. NFT Campaign Review (15 Minutes)

## CRITICAL PATH ITEMS

- UI UX Finalization 6/30/22

- NFT Layered files required asap

- NFT Purchase on Credit Card

- NFT Purchase with Crypto

- NFT Custodial Wallet

- Campaign Communities

- Stardom Marketplace

- Secondary Marketplaces

- 500 Pre Pre Sale Unit Logistics

- Launch Timeline (Whitelist Start / End / Buy day) (Launch Day)

- Goals / Probabilities

- Cold Wallet Issuance Ship to UI Process

-NFT Technology Key Technology Components(Nextjs App)Node Server) (MYSQL DB) (Wyre) (Polygon Blockchain)

- Image Accessory - Feature - Benefit (Relationship Tree) priority drop dependency critical path item

- 9500 Will Be the Number

- 500 To Remain in Treasury


**5. Technology Summary (30 Minutes)**

**a. Domain Directory**

- Stardomchance.com - web 3.0 application

-http://stardom.ciright.com.s3-website-us-east-1.amazonaws.com/- admin.stardomchance.com (staging)

- Countdown page (temp html page)

- Community.stardomchance.com *

- eam.stardomchance.com *

- note.ciright.com

- hrm.stardomchance.com

- deck.stardomchance.com

- stardom.ve.ciright.com

- nft.stardomchance.com

- nft.ciright.com (admin application for managing collections)

**b.Technology Management Leadership and Points of Contact**

- Neel Shah , Ankit Mekwan, Saloni Santani,

Technology Deliverables

- Stardom 1.0 Application

- NFT Market place

- UI UX PM (Saloni Santani) - Future Digital Review Process Approval Requirements

**c. EAM - Enterprise Affiliate Management**

- Ambassador

- Influencer

- Brand

- Studios

Ambassador recruitment and onboarding process

Ambassador channel compensation gross amounts and CCDN process

Ambassador contractual agreement terms and conditions

Custom Terms for Ambassador Agreements

Ambassador Influencer Margin DIstribution

**6. Existing and Additional Business Analysts (15 Minutes)**

- Ambimat Human Capital Services

- 3 Dedicated BA's

- Stardom Email Account Requirements

- Ongoing Financial Responsibility

- Outstanding Financial

- Additional Resource Requirements


**7. Human Capital Required Positions (15 Minutes)**

- Business Analyst (3 existing, 1 new US and Time Zone)

- Social Media Team (Manger, Creator, )

- Production Associate (to manage all ilm production details)

- Marketing Associate

- Big Data Analyst (all related sites and social media details)

**- COO**

- Full Stack Developer

**- CFO**

**- CMO**

- LSK , Out of Dallas


**8. Executive Contract Administrator (10 Minutes)**

- Management of all corporate contracts

- All ambassador contract terms for digital contract

- All Ambassador physical contract documents

- Oversight of all financial commitments

- Management of all Digital Terms and Conditions

- Benefiting Foundation Contract

- Digital Contracting Recording

- Contracted Incentive Compensation Documentation

- Capital Raise Documentation (PPM) (JOINER) (DISCLOSURERS) (ETC)

- $4000 Per Month For Above

(100k of Hunny 400k to Ciright liability future payment responsibility)

(Possible Social Medial Services, the writing and proofing of the words for each post, performed and managed on a $2000 / Month basis differed)

- Social Medial Oversight Post Management Creation, Proff, Post, Schedule-
https://dataroom.stardomchance.com/app

## 9. NFT Campaign Use of Proceeds ($200) ($250) ($300) (15 Minutes)

- Movie Production Reserver

- Sponsored Foundation Fees

- Ambassador / Influencer Commissions

- Minting Fees

- Cold Storage Wallet Fees

## - JV Defined Employment Contract

- JC Financial Management Responsibility

- Estimated Platform Managed Services Scale and Budget

- Inbound Traffic Machine Plans for Automated Growth

**10. JV Employment Contract (10 Minutes)**

- Salary

- Responsibilities

- Goals

- Strategis

- Tactics

- LANE

- Allowable Expenses

- Expense Approval Process

- Reimbursement Process


**11. Pending Stardom Competition Web App Deliverables (15 Minutes)**

- Testimonies (Admin Populated)

- Our Team (Image, Title, Description, Order)

- Dynamic Content and messaging

- FAQ (Admin Populated)

- Contact Us (Admin Populated)

- Online Realtime Chat (Phase 2)

- Ingestion of interests table data

- Screen Play Contest Rating Scoring (UI / Database / API)

- Verify contact us API pinning (teams dependencies)

- Benefiting Foundation (Text and Pop Up Form)

- Community API Verify live connectivity currently data staging

- Discussions - Functionality Definition Review Required

- Profile Ability to manage easily QA QC Required

- Profile Submissions Logic UI UX

- Profile Method of payments UI UX

- Profile Connections UI UX

- Profile Community Ranking 1/31311 Based on Points

- Profile Community Points Points Demon Each Day Sum Rank Activity

- Favicons for each URL

- Competition Evaluation Processes

- Utilize Posterity Film Images

- 3 D Curtains


Technology URL Persona Class Directory

## 12. Trademarks

- Stardom Chance


## 13. Insurances

- Key Man Insurance

- DOE Insurance

- Film Bonding


## 14. Office Location HQ

- Office

- People

-

15. BA Accruee Invoices

Jan - use 3 BA

$1500 Each Per Month

$4500 * 6 = $27,000 Past Due

July onward billed monthly

INVOICE TO BE PROVIDED FOR THE 7 MONTHS OF SERVICES PROVIDED AND DIFFERED.

_____

**Additional Future Agenda Items**